UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,       : 24-mj-00404-CLP-4
                                :
                                :
     - versus -                 : U.S. Courthouse
                                : Brooklyn, New York
LONG PHI PHAM,                  :
                                : June 4, 2024
              Defendant         : 2:41 p.m.
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
BEFORE THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**


**For the Government**:        **Breon S. Peace, Esq.**
                              United States Attorney

                       BY:    **Benjamin Weintraub, Esq.**
                              **David Berman, Esq.**
                              Assistant U.S. Attorneys
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


**For the Defendant**:         **Michael L. Soshnick, Esq.**
                              Law Office of Michael L.
                               Soshnick
                              170 Old Country Road, Ste. 307
                              Mineola, NY 11501


**Transcription Service**:     **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  This is a Criminal Cause for

2   Arraignment on the complaint, *USA v. Long Phi Pham*.  The

3   case number is 24-mj-404.

4          Counsel, your name for the record?  Appearing

5   for the government?

6          MR. WEINTRAUB:  Good afternoon, your Honor.

7   Benjamin Weintraub and David Berman for the United

8   States.

9          THE CLERK:  Thank you very much.

10          THE COURT:  Good afternoon.

11          THE CLERK:  And appearing for Mr. Pham?

12          MR. SOSNICK:  Good afternoon, your Honor.  It's

13   a pleasure to appear before you.  My name is Michael L.

14   Sosnick and I'm appearing on behalf of Mr. Pham.

15          THE CLERK:  Thank you very much.

16          THE COURT:  Good afternoon.  Good afternoon,

17   Mr. Pham.

18          THE DEFENDANT:  How are you doing?

19          THE COURT:  I take it you understand English?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Okay.  If at any point something is

22   said that you don't understand, please tell me.  All

23   right?

24          THE DEFENDANT:  Thank you.

25          THE COURT:  You're here today because the

Proceedings

1    grand -- excuse me.  You're here today because you've

2    been charged in a complaint with in or about and between

3    January 2024 and the present, both days being approximate

4    and inclusive within the Eastern District of New York and

5    elsewhere, you together with others did knowingly and

6    intentionally conspire to devise a scheme and artifice to

7    deprive betting company 1, an online sports betting

8    company, the identity of which is known to the affiant of

9    the complaint, and that you obtained money and property

10   from betting company 1 by means of one or more materially

11   false and fraudulent pretenses, representations, and

12   promises.  And for the purpose of executing this scheme,

13   you transmitted and caused to be transmitted by means of

14   wire communication in interstate and foreign commerce

15   writings, signs, signals, pictures, and sounds in

16   violation of United States law.  Have you seen the

17   complaint before?

18           THE DEFENDANT:  I looked at it briefly.

19           THE COURT:  Okay.  All right.  Now, you do not

20   have to say anything here today.  If you start to say

21   something, you can stop at any time.  But what you must

22   understand is that anything you do say, except what you

23   say to your attorney, anything else can be used against

24   you.  Do you understand that?

25           THE DEFENDANT:  I understand.

4

Proceedings

1          THE COURT:  Okay.  Now, I understand counsel,

2   you are retained in this matter?

3          MR. SOSNICK:  Yes, your Honor.

4          THE COURT:  Okay.  So Mr. Pham, I know you have

5   retained counsel but if for some reason at any point in

6   the future that you cannot afford counsel, the Court will

7   appoint an attorney for you.  That is because you have

8   the right to be represented by an attorney from this

9   point forward in connection with these charges.  Do you

10  understand that?

11         THE DEFENDANT:  I understand.

12         THE COURT:  Okay.  What's the -- well, let me

13  ask, first of all, counsel, I take it that you have

14  reviewed the complaint with your client and advised him

15  of his rights?

16         MR. SOSNICK:  Yes.

17         THE COURT:  Okay.  What's the government's

18  position with respect to bail for Mr. Pham?

19         MR. WEINTRAUB:  Your Honor, the government is

20  seeking detention at this time.  The government's

21  position is that there are no conditions or set of

22  conditions that can reasonably assure the Court of the

23  defendant's future reappearance at court proceedings.

24         In short, the defendant, and specifically his

25  conduct over the last few days, has demonstrated that he

5

Proceedings

1    poses a significant risk of flight.  I'm happy to

2    elaborate on that further at the moment.

3            THE COURT:  Yes, please.

4            MR. WEINTRAUB:  The circumstances surrounding

5    the defendant's arrest really speak volumes here.  And I

6    can just start the story last week.

7            On Thursday, the government attempted to

8    interview one of the defendant's co-conspirators.  On

9    Friday, one day later -- and that's a co-conspirator that

10   the government knows to be in continued communication

11   with the defendant.  The next day, the defendant booked a

12   one-way ticket to Australia which the government learned

13   about on Monday.  That flight that he booked on Friday

14   was scheduled to depart on Monday, three days later.

15           The government arrested him while he either was

16   on the plane or had checked in for the flight clearly

17   with an intention to board that flight.

18           In the defendant's possession at the time that

19   he was arrested was over $12,000 in U.S. cash which the

20   defendant did not declare as is required on U.S. Customs

21   forms and which just by nature of having it in his

22   possession as he attempted to board a flight to Australia

23   without declaring it is prima facie evidence of a

24   violation of the Bulk Cash Smuggling Act which is 31 U.S.

25   Code 5332(a).

6

Proceedings

1        And in addition to the over $12,000 in cash

2   that he had in his possession, he had two cashier's

3   checks which are the functional equivalent of cash, one

4   for $30,000 and one for $50,000, both made payable to him

5   in his name.

6        In addition to that, he had three cell phones

7   in his possession.  In addition to that, he had multiple

8   betting slips showing recent wages on sports betting

9   which of course is concordant with all of the conduct

10  alleged in the complaint.

11        Your Honor, the government submits that that

12  pattern of behavior, booking a flight, a one-way ticket

13  to Australia the day after the government attempts to

14  interview a co-conspirator with whom the defendant is in

15  regular communication and attempting to board that flight

16  with $80,000 in cashier's checks, an additional $12,000,

17  none of which he declared, so that's in total over

18  $90,000 that had to be declared that was not declared,

19  and three cell phones, or strong indicia that he was

20  attempting to flee the country.  He has long known about

21  the government's investigation.  And as the circle began

22  to tighten, he took steps to flee.

23        In addition, as the complaint sets forth in

24  paragraph 35, there's at least one example of the

25  defendant and other co-conspirators participating in

7

Proceedings

1  group text message chats in which they discuss a

2  destruction of evidence on their cell phones relating to

3  the conduct that underlies this investigation.

4          Your Honor, 18 U.S. Code 3142(f)(2)(A) and (B)

5  talk specifically about attempts or concerns that the

6  defendant will either flee, that's subsection (A), or

7  obstruct justice, that's subsection (B).  The government

8  submits that there is evidence already that the defendant

9  has engaged with his co-conspirators in attempts to

10  obstruct justice both by the destruction of evidence and

11  to flee as evidenced by his conduct in response to the

12  government investigation.

13          For those reasons, the government submits that

14  there are no set of condition that can assure his

15  reappearance.  And if we get to the suretors, the

16  government has concerns with that as well which I'm happy

17  to address now or --

18          THE COURT:  Sure.  Why don't I hear you on the

19  suretors since --

20          MR. WEINTRAUB:  So just to start off the top,

21  at least one of the three suretors has conduct that is

22  within the -- is engaged in conduct that is within the

23  scope of the government's investigation and has engaged

24  in numerous sports bets that are within the government's

25  investigation and has made transfers that -- the

8

Proceedings

1   complaint talks about transfers made, they are peer to

2   peer payment applications, Venmo, Zelle, things of that

3   nature.

4           One of the suretors has engaged in numerous

5   payments using those apps with numerous of the defendants

6   in this case as well as numerous other individuals who

7   are subjects of the government's investigation.  So that

8   person who has engaged in suspicious sports betting and

9   has engaged in numerous financial transactions with co-

10  defendants and other co-conspirators who are not charged

11  renders that person I think fiducially unfit to be a

12  suretor.

13          With respect to the other two suretors, one of

14  them -- neither of them speaks to the defendant very

15  frequently but they speak maybe once a week.  One of them

16  is a stay-at-home mother who makes no money and has no

17  income and for that reason is not a particularly viable

18  suretor.  And the third suretor would be acceptable, but

19  that's just one of three.

20          And your Honor, the fact that the defendant is

21  proposing to even offer one of the suretors who is, and

22  the defendant surely knows this, given the overlap

23  between that person's betting activity and money transfer

24  activity, you know, at the very least a co-conspirator,

25  unwitting co-conspirator in this conduct is troubling in

9

Proceedings

1   and of itself.

2            THE COURT:  Okay.  Counsel?

3            MR. SOSNICK:  Thank you, your Honor.  My client

4   is 38 years old.  He's a United States citizen.  He came

5   to this country from Vietnam when he was a little boy.

6   He's lived in Queens for the past 32 years.  He's never

7   been convicted of a crime.  He engages in professional

8   poker playing.  When I spoke with him, he told me he's in

9   the top 1 percent in the world in professional poker

10  playing.

11           He was going to Australia to participate in a

12  poker competition and from there he was going to go to

13  Japan and then return to New York.

14           My client has been charged with one count of

15  wire fraud.  There's been no allegation of any violence.

16  There's been no allegation of anybody being injured.  And

17  in this case, because I looked at the report from

18  Pretrial Services recommending that the defendant be

19  released with an unsecured surety insurance bond cosigned

20  by at least two financially responsible people, I had my

21  client's three sisters appear in court.  One flew here

22  from Texas.  The other two live in Queens.  One is a

23  stay-at-home mom, as the prosecutor said, but she's

24  married to a man who works and supports the family and

25  earns approximately $65,000 a year.

10

Proceedings

1    The other two sisters who live here in the

2  Eastern District of New York, Queens County to be

3  specific, are a pharmacist who makes approximately

4  $150,000 a year, and a registered nurse who makes

5  approximately the same amount of money.  All three

6  sisters love their brother very much.  They have moral

7  suasion over him.  They are in touch with him on a weekly

8  basis, sometimes more frequently, and they will do

9  whatever is necessary to ensure that their brother comes

10  to court because they love him, they want him to do the

11  right thing, they expect him to do the right thing.  And

12  they're willing to cosign a bond as is recommended by

13  Pretrial Services in whatever amount the Court deems to

14  be appropriate, $100,000, $250,000.

15    The recommendation of Pretrial Services is that

16  this unsecured bond be cosigned by at least two

17  financially responsible people.  Clearly two sisters who

18  earn approximately $150,000, one is a licensed

19  pharmacist, and one is a licensed registered nurse, who

20  both live in this district are financially responsible

21  individuals.

22    The additional conditions are report to

23  Pretrial Services as directed.  My client will do

24  whatever he's directed to do.  His travel is supposed to

25  be restricted to New York City, Long Island, and as

11

Proceedings

1    approved by Pretrial Services.  He's agreeable to that.

2            Surrender passport and do not obtain any new

3    travel documents.  The government has already obtained my

4    client's passport when he attempted to go to abroad to

5    participate in that international poker competition and

6    he certainly will not seek to obtain any new travel

7    documents.

8            Be subject to random home and/or employment

9    visits.  His door is wide open.  He has no secrets.  And

10   he will be very happy to greet any government agents who

11   want to come and see what he is doing and how he's

12   living.  He's always led a law abiding life.  As I said,

13   he's 38 years old with no prior criminal history of any

14   kind or nature whatsoever.

15           The fifth condition is that he actively seek or

16   maintain legitimate and verifiable employment.  He's all

17   in for that.

18           And finally, no contact with any co-defendants

19   or co-conspirators.  I note that the government said that

20   there were text messages, but there never was any

21   destruction of any evidence.  There is no obstruction

22   charge.  There's just the one wire fraud.  Now that

23   Pretrial Services has weighed in on this topic of not

24   having any communication with co-defendants or co-

25   conspirators, if the Court includes that in the

Proceedings

1   conditions of release, my client will have no such

2   contact.

3           I want to be clear the government has

4   suspicions and has concerns, but at the end of the day

5   we're dealing with a nonviolent crime, a single count of

6   wire fraud against --

7           THE COURT:  Well, it sounds like he's going to

8   be possibly charged with transporting money out of the

9   country without reporting it which is often a crime we

10  see here.  So I understand what you're saying but I'm

11  concerned about the package itself.  Which of the

12  suretors that's been offered, the pharmacist or the

13  nurse, is the one that you have concern about?

14          MR. WEINTRAUB:  It's the pharmacist, the one

15  who makes $150,000 and lives here in Ozone Park.  And

16  there are several other concerns that we have based on

17  some of the representations made by counsel.  Of course,

18  Pretrial Services' recommendation, I'm not sure if they

19  were aware of the items that were in the defendant's

20  possession when he was attempting to board the flight.

21  So I just don't know if they were or they weren't, but

22  the Court is now aware of those facts.

23          The assurances that the defendant will not

24  communicate with co-defendants is concerning because the

25  government already has reason to believe that there are

13

Proceedings

1   individuals, or at least one individual, who speaks to

2   all the defendants.  Okay?  There's an individual who at

3   one point represented to the government that he

4   represented another one of the defendants.  And based on

5   information that the government knows, that defendant was

6   introduced to that individual from another one of the

7   defendants.

8           THE COURT:  When you say represented, in the

9   legal sense?

10          MR. WEINTRAUB:  Yes.

11          THE COURT:  Okay.

12          MR. WEINTRAUB:  The government was contacted by

13  an individual who claimed that he represented one of the

14  co-defendants at a certain point in time.

15          THE COURT:  I see.

16          MR. WEINTRAUB:  Today the defendant, when he

17  was attempting to obtain counsel, told Federal Defenders

18  that he wanted to call that same person in an attempt to

19  have that person represent him or have that person assist

20  him in finding representation.  That same person was

21  introduced to one of the other defendants by a third

22  defendant.

23          So my point is that there's a single individual

24  or we know to be in communication with three of the co-

25  defendants.  So there's a very obvious and easy way for

14

Proceedings

1  the defendant to not violate the terms of pretrial

2  release and still communicate with his co-conspirators.

3  We know that he has communicated with co-conspirators in

4  the presence of that individual who maybe represents some

5  of them, maybe doesn't.  So that is a concern to the

6  government.

7          The fact that the defendant claims to be in the

8  top 1 percent of all poker players in the world means he

9  would have a lot of money and all the resources in the

10  world to flee, and a sister who makes $140,000 a year,

11  you know, (A), could easily take the hit of a bail

12  jumping charge in the event that this defendant really is

13  one of the top 1 percent poker players in the world, but

14  also the government's investigation has uncovered

15  substantial evidence of serious concerning conduct

16  regarding poker playing in particular.  It's not in the

17  complaint.  The government of course can proffer facts to

18  the Court that are not in the complaint.  But the

19  defendant has long been involved in poker playing and in

20  helping to run and organize underground poker games here.

21          And so the defendant's continued involvement in

22  poker playing is not a fact that the government views

23  enures to his sort of benefit.  It is part and parcel of

24  a world of illicit gambling activity both poker gambling

25  and sports betting gambling that is the very core of the

15

Proceedings

1   case here.

2          THE COURT:  Okay.  Anything you want to add,

3   counsel?

4          MR. SOSNICK:  Your Honor, before the government

5   convicts every one of my client's family members this

6   afternoon, I simply want to point out that my client has

7   led a law-abiding life ever since he came to this

8   country.  He loves this country.  He is a good citizen

9   with no criminal history of any kind or nature

10  whatsoever.

11          As far as these checks are concerns, my client

12  denies that he had negotiable checks in his possession.

13  And with respect to the count of the cash, if it was

14  $12,000, then yes, it was $2,000 over the amount that

15  would require reporting.  I'm not sure that my client

16  knew exactly how much money he had in his possession.

17          But be that as it may, the point I'm making to

18  the Court is that my client is willing to sign a bond in

19  whatever amount the Court directs.  And all three of his

20  sisters, who are in court today, who have moral suasion

21  over my client, are willing to cosign that bond.  And

22  these allegations that my client can make all kinds of

23  money and that whatever the amount of the bond is the

24  sisters can take the hit, it's just in my opinion

25  inappropriate.  It's inappropriate.  We have three

16

Proceedings

1   sisters who are all United States citizens who love their

2   brother, who have no criminal convictions and have no

3   criminal history of any kind or nature whatsoever.  They

4   come to a courthouse in the United States of America to

5   cosign a bond and they're accused of all kinds of

6   nefarious activities including signing a bond and not

7   worrying about the consequences of signing the bond.

8           They're very much aware of the circumstances

9   surrounding the signing of a bond, the serious nature of

10  signing a bond in a United States courthouse.  But they

11  love their brother and they know he will come back to

12  court whenever he's required to be here and that he will

13  abide by all of the conditions of the Court and Pretrial

14  Services.

15          And I'm simply asking the Court to follow the

16  recommendation of Pretrial Services in a case involving a

17  United States citizen with no prior criminal history in a

18  case involving one count of wire fraud.

19          MR. WEINTRAUB:  Your Honor, the government has

20  photos of the two cashier checks that were found in the

21  defendant's luggage, so I'm not sure what basis there is

22  to assert that he didn't have those in his possession.  I

23  don't see how they could have gotten in there by

24  accident.

25          And the government is by no means accusing all

17

Proceedings

1    of the suretors of anything.  The government is accusing

2    one of the suretors of being involved and having a

3    pattern of suspicious sports betting activity and

4    suspicious money transferring activity that is at the

5    very least suspicious and potentially involved in a money

6    laundering activity just given the nature of transferring

7    money to a number of co-conspirators and co-defendants.

8    And the government's not accusing any of the suretors of

9    taking lightly the responsibilities of being a suretor.

10   The government is raising concerns over the defendant's

11   willingness to abide by the terms of his bail.

12          And just one last thing, your Honor.  The idea

13   that he was going to Australia for a poker tournament, he

14   booked the ticket on a Friday to leave on a Monday, a day

15   after an attempt to interview a co-conspirator.  That's

16   much more in line with attempts to flee than attempts to

17   go play in a poker tournament halfway around the world on

18   a one-way ticket.

19          MR. SOSNICK:  Your Honor, regardless of the

20   government's conjecture on this point, my client stands

21   by what he told me and I must point out that neither the

22   singular charge against my client nor any of the

23   potential charges that have been raised in the

24   government's presentation to this Court require any jail

25   time and therefore, for him to be detained when he's

18

Proceedings

1   entitled to the presumption of innocence --

2           THE COURT:  Let me just stop you for a second.

3   There's no potential jail time for the --

4           MR. SOSNICK:  I think --

5           THE COURT:  -- charge contained in the

6   complaint?

7           MR. WEINTRAUB:  I think what he might be

8   referring to is there's no mandatory minimum.  There's a

9   20-year statutory maximum for conspiracy to commit wire

10  fraud.

11          THE COURT:  Okay.  I just wanted to correct the

12  record --

13          MR. WEINTRAUB:  I believe that's what he might

14  have been --

15          THE COURT:  -- because I wasn't quite sure what

16  statutory charge was here that didn't require --

17          MR. SOSNICK:  Counsel is correct.  I'm saying

18  there is no mandatory --

19          THE COURT:  Okay.  Fine.  Thank you.

20          MR. SOSNICK:  -- jail time for this singular

21  charge or any of the other charges that were discussed by

22  the prosecutor.  And to just lock my client up when

23  he's --

24          THE COURT:  Well, let me -- I'm just going to

25  stop you right here because here's what I'm going to tell

19

Proceedings

1  you.  I don't think the package you offered is

2  sufficient.  I'm not prepared today to say that there are

3  no conditions or combination of conditions that would

4  result will provide the government and the Court with the

5  assurances that your client would come back.

6          But the circumstances behind the purchase of

7  the ticket at the last minute, the fact of the money

8  and --

9          THE DEFENDANT:  There's no $80,000 cashier's

10  check, your Honor.

11          MR. WEINTRAUB:  I have a photo of them.

12          THE COURT:  Okay.

13          MR. WEINTRAUB:  I mean --

14          THE DEFENDANT:  That's just a deposit from

15  months ago.

16          THE COURT:  You know what?  You need to not --

17          THE DEFENDANT:  I can't --

18          THE COURT:  -- speak.  As I said, anything you

19  say to me could later come back to haunt you if the

20  government can prove you're wrong.  So if you want to

21  speak to me, I really urge you to talk through your

22  attorney.  Okay?  So --

23          THE DEFENDANT:  Your Honor, I don't need to

24  talk to my attorney for this one.  There's no $80,000

25  cashier's check.  And if there is, you can cuff me now.

20

Proceedings

1    I stand by it.  There's no $80,000 cashier's check.

2            THE COURT:  I mean we can put it into evidence,

3    but I'm still going to rule the way I was going to rule

4    regardless which is I don't find the package sufficient.

5    The questions raised about the one suretor raised

6    questions in my mind about whether or not the suretor's

7    involvement in the sports betting scheme if you will

8    makes her an acceptable financially responsible suretor.

9            I'm sure his other sister who is a homemaker

10   would be a perfectly fine person to provide moral

11   suasion.  But given the amount of money involved here, I

12   think the single signature of one financially responsible

13   suretor is not sufficient.

14           And so I'm going to order him detained but

15   you're free to come back to court at any point if you can

16   come back with more financially responsible suretors and

17   persuade the Court that your client is going to come back

18   to court.

19           MR. SOSNICK:  Your Honor, I tried to work out

20   the bail package with the government and they said you

21   can't.  Basically pushed me away and said we don't agree

22   to anything.  We're going to contest this.  We want him

23   detained.

24           THE COURT:  I understand.  You don't have to

25   have the government's agreement.  You can come back and

21

Proceedings

1  make another bail application that is more persuasive

2  hopefully.  Okay?

3          MR. SOSNICK:  So your Honor, you want more than

4  the three sisters to cosign?

5          THE COURT:  Well, one of the sisters is not an

6  acceptable suretor.  Yes, I want --

7          MR. SOSNICK:  So two are?

8          THE COURT:  I want another financially

9  responsible suretor.

10          MR. SOSNICK:  Well your Honor, I just want to

11  draw your attention to the --

12          THE COURT:  I am not bound by the

13  recommendation --

14          MR. SOSNICK:  No, I'm not saying --

15          THE COURT:  -- of Pretrial Services.

16          MR. SOSNICK:  I'm not saying you are.

17          THE COURT:  And based on that recommendation,

18  you haven't satisfied it.  You have one financially

19  responsible suretor, the nurse I guess, and the other

20  one, homemaker, is an acceptable suretor but she doesn't

21  have any money.  So she has no income, therefore, she is

22  not a financially responsible suretor.

23          MR. SOSNICK:  So your Honor, if I have her

24  husband cosign the bond together with the registered

25  nurse who is the sister, then you have two financially

22

Proceedings

1   responsible suretors and that's what I would suggest to

2   the Court.  And you could make the bond for any amount

3   that you think is fair and reasonable.

4            THE COURT:  Is the husband here?

5            MR. SOSNICK:  No, he's not here.

6            THE COURT:  Okay.  Well, I'm not about to enter

7   a bond today without seeing him and having the government

8   interview him and Pretrial interview him to make sure he

9   is an acceptable suretor.  So you can come back, as I

10  said, but I'm not going to enter a bond today.  He's

11  going to be detained.  Okay?

12            MR. SOSNICK:  I hope the government's happy.

13  We're certainly not.

14            THE CLERK:  And I guess we have the issue of a

15  preliminary hearing.

16            MR. SOSNICK:  When is it scheduled for?

17            THE CLERK:  Well, I think ten days if --

18            MR. SOSNICK:  14 days I thought.

19            THE CLERK:  Sorry, 14, yes.  In two weeks.

20            MR. SOSNICK:  So what's the day?

21            THE CLERK:  Are you waiving or you would

22  like --

23            MR. SOSNICK:  What's the day?

24            THE CLERK:  Well, if you are not waiving, then

25  today's the 4th, so I guess it would be like June 18 for

23

Proceedings

1    a preliminary hearing at your request.  The government

2    has until June 18th to indict or dismiss or for more

3    time.

4               MR. SOSNICK:  I'd like to discuss this issue

5    with my client because it's not something we discussed.

6               THE CLERK:  Yeah, you can do that now if you

7    want and address it today.

8               THE COURT:  We could always schedule the

9    preliminary hearing and if you decide that your client

10   wants to waive it, just let us know and it just won't go

11   forward.  That's fine.

12              MR. SOSNICK:  All right.  And what about a date

13   to come back, your Honor, assuming I can arrange for

14   transportation for the brother-in-law's appearance here

15   in court from Texas?

16              THE COURT:  Well, what I would say is find out

17   when he can be here and just let us know.

18              THE DEFENDANT:  Tomorrow.

19              MR. SOSNICK:  Just a second, please.  Your

20   Honor, do you sit in the morning or only the afternoon?

21              THE COURT:  No, we sit in the morning at 11 or

22   2.

23              MR. SOSNICK:  Okay.  So I just want to be sure

24   he's here.  All right.  Then your Honor, what about

25   tomorrow at 2 o'clock?

24

Proceedings

1          THE COURT:  Sui May?

2          THE CLERK:  It would be fine.

3          THE COURT:  Okay.  2 o'clock tomorrow.

4          MR. SOSNICK:  Thank you very much, your Honor.

5          THE CLERK:  I guess I'll do a temporary or

6    should I just (inaudible) --

7          THE COURT:  Yes, that's fine.

8          THE CLERK:  That's fine, okay.  So tomorrow at

9    2 o'clock.

10          MR. SOSNICK:  Very good.

11          THE CLERK:  We'll make sure he's back because I

12    think it's a little bit late for (indiscernible).

13          MR. WEINTRAUB:  I'll make sure.

14          THE CLERK:  Thank you.

15          THE COURT:  Okay.  I direct the prosecution to

16    comply with your obligations under *Brady v. Maryland* and

17    its progeny to disclose to the defense all information

18    whether admissible or not that is favorable to the

19    defendant material either to guilt or to punishment known

20    to the prosecution.

21          Possible consequences for noncompliance may

22    include dismissal of individual charges or the entire

23    case, exclusion of evidence, professional discipline or

24    court sanctions on the attorneys responsible.

25          I will be entering a written order more fully

25

Proceedings

1  describing this obligation and the possible consequences

2  of failing to meet it and I direct the prosecution to

3  review and comply with that order.

4          Does the prosecution confirm that you

5  understanding your obligations and will fulfill them?

6          MR. WEINTRAUB:  Yes, your Honor.  Is a date for

7  the preliminary hearing set?

8          THE CLERK:  Do you want to deal with it

9  tomorrow?

10         MR. SOSNICK:  Yeah, let's defer that to

11 tomorrow and hopefully we'll be able to resolve the bail

12 issue tomorrow and then hopefully we'll be able to waive

13 the preliminary hearing as well.

14         THE CLERK:  Okay.

15         MR. SOSNICK:  Thank you very much.  Your Honor,

16 I appreciate all the time and consideration.

17         THE COURT:  Oh, no.  Thank you.

18         MR. SOSNICK:  We do look forward to seeing you

19 tomorrow afternoon.

20         THE CLERK:  Okay.  Thank you.  Preliminary

21 hearing not dealt with.

22                    (Matter concluded)

23                         -oOo-

24

25

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **10th** day of **June**, 2024.

*Mary Greco*

Transcriptions Plus II, Inc.